862 P.2d 1184 (1993)
STATE INDUSTRIAL INSURANCE SYSTEM, an Agency of the State of Nevada, Appellant,
v.
John CAMPBELL, Respondent.
No. 22409.
Supreme Court of Nevada.
November 3, 1993.
R. Scott Young, Gen. Counsel, William A. Zeigler and John McGlamery, Associate Gen. Counsel, Carson City, for appellant.
Marvin S. Gross, Las Vegas, for respondent.

OPINION
PER CURIAM:
The sole issue on appeal is whether temporary total disability benefits may be suspended during the time in which a claimant is incarcerated. Absent legislation to the contrary, we hold that they may not.

THE FACTS
The facts in this case are undisputed. John Campbell sustained a compensable industrial injury on August 11, 1988, while working as a brick layer at Cedco, Inc. Campbell qualified for temporary total disability benefits and was referred to the Jean Hanna Clark Rehabilitation Center for treatment. On August 4, 1989, Campbell's treating physician, William Harris, M.D., recommended that Campbell be discharged from the rehabilitation center and given a comprehensive integrated work-up ("CIW") to evaluate the extent of his disability.
*1185 The State Industrial Insurance System ("SIIS") notified Campbell by letter, dated October 12, 1989, that a CIW had been scheduled for him on October 30, 1989, in Reno, Nevada. Shortly thereafter, SIIS was advised that Campbell would be unable to attend the CIW because he had recently been incarcerated.[1] SIIS subsequently advised Campbell that his temporary total disability benefits would be suspended pending completion of the CIW.
On May 1, 1990, a hearing officer entered a decision affirming the suspension of Campbell's benefits. Campbell was released from prison on September 17, 1990, and testified as the only witness at the hearing before the appeals officer on October 8, 1990. On November 9, 1990, the appeals officer reversed, and ordered SIIS to pay retroactively Campbell all suspended benefits. The district court agreed and denied a SIIS petition for judicial review.

DISCUSSION
In reviewing a decision by an administrative officer, an appellate court may not substitute its judgment for that of the officer as to the weight of evidence on questions of fact. Nevada Indus. Comm'n v. Hildebrand, 100 Nev. 47, 52, 675 P.2d 401, 404 (1984); NRS 233B.135(3). However, this court may "undertake independent review of the administrative construction of a statute." American Int'l Vacations v. MacBride, 99 Nev. 324, 326, 661 P.2d 1301, 1302 (1983) (citations omitted); see also NRS 233B.135(3)(a).
This is a matter of first impression for this court. Chapter 616 of Nevada Revised Statutes does not address the issue of whether disability benefits may be suspended when a claimant is incarcerated. Nevada statutes provide only one specific condition whereby temporary total disability benefits may be suspended by SIIS: where a claimant voluntarily refuses to receive, or obstructs the completion of, a required examination. NRS 616.535(4).[2] And the only circumstances provided by Nevada law allowing for the permanent discontinuance of disability benefits is "when any physician or chiropractor determines that the employee is capable of any gainful employment." NRS 616.585(4)[3]; see also Chappaz v. Golden Nugget, 107 Nev. 938, 822 P.2d 1114 (1991). The appeals officer concluded that Campbell had neither obstructed nor refused to submit to a CIW, and that no physician had discharged Campbell "to return to gainful employment."
SIIS suggests that the term "obstruct," as used in NRS 616.535(4), means any voluntary act which results in a claimant failing to submit to a required examination. However, we interpret "obstruct" as meaning a volitional act with intent to hinder a required examination. Such an interpretation is in harmony with our policy of construing workers' compensation statutes liberally for the protection of the worker. Ransier v. SIIS, 104 Nev. 742, 746, 766 P.2d 274, 276 (1988) (citing Dep't Ind. Relations v. Circus Circus, 101 Nev. 405, 411-12, 705 P.2d 645, 649 (1985)).
*1186 The general rule of liberal construction of the workers' compensation statutes does not justify the inclusion or the exclusion "of a substantive right that cannot be supported by any fair reading of the statutory scheme." Weaver v. SIIS, 104 Nev. 305, 306, 756 P.2d 1195, 1196 (1988). We have consistently held that "where a policy consideration advocates exclusion of coverage, the legislature is perfectly capable of implementing such policy." Goldstine v. Jensen Pre-Cast, 102 Nev. 630, 631, 729 P.2d 1355, 1356 (1986) (emphasis added) (citing SIIS v. Conner, 102 Nev. 335, 721 P.2d 384 (1986)). "The purpose of the [workers' compensation] system is to provide compensation for industrial injuries." Id., 102 Nev. at 631, 729 P.2d at 1356 (citing Breen v. Caesars Palace, 102 Nev. 79, 715 P.2d 1070 (1986)).
SIIS further argues that the phrase "capable of any gainful employment" in NRS 616.585(4) clearly implies a legislative intent to grant benefits for the replacement of lost wages. As a prisoner, Campbell's daily necessities were provided for by the State at no cost to him. Consequently, SIIS maintains that since Campbell could not enter the work force while incarcerated he did not lose any wages. While we are sympathetic to this argument, the simple fact is that Chapter 616 of the Nevada Revised Statutes does not provide for the withholding of disability benefits while a claimant is incarcerated, and we will not attempt to create such a disability.[4]
The dissent relies solely on Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984), for the proposition that public policy dictates an outcome in favor of SIIS. The circumstances herein, however, are clearly distinguishable from Harrah's. In Harrah's, we adopted a remedy for employees discharged in retaliation for filing workers' compensation claims. Harrah's did not, as the dissent is well aware, involve the exclusion of workers' compensation benefits. Our decision in favor of the employees in Harrah's was in accord with our "long-standing policy ... to liberally construe [Nevada's workers' compensation laws] to protect injured workers and their families." Id. at 63, 675 P.2d at 396. We are not persuaded by the dissent to depart from that policy today.
The rule of exclusion proposed herein by SIIS is simply "not properly adopted by the courts." Goldstine, 102 Nev. at 632, 729 P.2d at 1357 (1986) (footnote omitted). A clear majority of other jurisdictions considering this identical issue agree. See Matter of Injury to Spera, 713 P.2d 1155 (Wyo.1986) (emphasis added); United Riggers Erectors v. Industrial Com'n, 131 Ariz. 258, 640 P.2d 189, 191 (1981); Crawford v. Midwest Steel Company, 517 So.2d 918, 923-924 (La.Ct.App.1987); DeMars v. Roadway Express, 99 Mich.App. 842, 298 N.W.2d 645 (1980).
We affirm the decision in favor of Campbell's receipt of the suspended benefits.
STEFFEN, Justice, dissenting:
I dissent.
*1187 In Hansen v. Harrah's, 100 Nev. 60, 675 P.2d 394 (1984), we properly filled a legislative void and provided public policy relief for an injured workman who was terminated in retaliation for filing a workmen's compensation claim. In Goldstine v. Jensen Pre-Cast, 102 Nev. 630, 729 P.2d 1355 (1986), we improperly (I suggested in dissent) allowed a worker to recover compensation, notwithstanding his fraud on the employer, because the legislature had not provided for such a contingency. Today we conclude that an incarcerated felon may collect workmen's compensation insurance because the legislature failed to deny coverage to such persons.
I am strongly opposed to judicial intrusion into the realm of the legislative branch of government. And yet, many times the courts are called upon to apply a rule of reason to legislative voids or lacunae in order to facilitate the purpose and intent of a statute.
The majority suggests that I have failed to recognize that in the Harrah's case we created law in order to grant relief to an injured worker, whereas the instant case would deprive a worker of benefits if my position were to prevail. In my view, the majority has simply missed the mark. In Harrah's, we ruled as we did in recognition of a strong public policy. The rationale of the opinion in Harrah's did not, as suggested by the majority, relate to a liberal construction of the workers' compensation laws in order to provide Hansen with his rightful benefits. There was simply no provision to construe as a basis for supporting our result in Harrah's. Rather, Harrah's was a proper recognition of a strong public policy against discharging an injured worker in retaliation for presenting a rightful claim for benefits. Had we ruled otherwise, there would have been a strong chilling effect on workers presenting their just claims for industrial injuries.
My reason for dissenting from the ruling of the majority is that I perceive a public policy in the instant case that is equally as strong as the public policy that prompted our ruling in Harrah's. Here, the majority provides Campbell a double dip from the taxpayers' funds. Moreover, Campbell's double recovery represents a form of reward for his criminal behavior. I suggest that neither result is justified.
It seems clear to me that this court would be no less properly advancing the common law by denying Campbell benefits to which he is not entitled than it was in granting Hansen relief in Harrah's which had never been provided by the legislature. My rationale for denying Campbell relief is based upon the identical principle that supported our ruling in Harrah's. Public policy should be just as controlling in the instant case as it was in Harrah's.
I thus have no difficulty discerning a public policy as strongly against the result reached by the majority today as the public policy that so compellingly favored the relief we accorded the injured workman that suffered retaliatory discharge in Harrah's. The majority, in permitting Campbell to reap a reward for his own wrongdoing, does so with an expression of regret attributable to the legislature's failure to provide for such a situation. In so reasoning, the majority neglects to remember that the legislature was equally silent with respect to the relief we fashioned in Harrah's.
Although I dissented in Goldstine because of the strong legal principle against rewarding persons for their own wrongdoing, at least in Goldstine we had an injured workman who was presumably in need of his daily subsistence. Here we have a claimant who, as a result of his own criminal conduct, received a prison sentence which, of necessity, required the furnishing of his daily food, clothing and lodging at taxpayers' expense. The majority contends in effect that because the legislature did not deny incarcerated persons workmen's compensation benefits during their periods of confinement, we must assume the dubious proposition that the legislature intended that such persons receive what is tantamount to a double recovery.[1] I find it as *1188 difficult to attribute such an intention to the legislature as it would have been to conclude that the legislature would have condoned retaliatory discharge under the Harrah's situation because it failed to provide remedial legislation for such a circumstance.
I consider equally unacceptable the majority's affirmation of the appeals officer's position that because Campbell was incarcerated, he "neither obstructed nor refused to submit to a CIW [comprehensive integrated work-up]...."[2] Who must we presume interfered with Campbell's appointment for the required CIW: the criminal justice system? the prison officials? or perhaps the inanimate facilities that restrained his ability to travel? I suggest that when Campbell used his free agency to commit a crime against society, thus subjecting himself to a potential loss of his personal freedom, that he and he alone frustrated the performance of the CIW, thus suspending his right to compensation. Perplexingly, the appeals officer and this court's majority impliedly conclude that someone, something, or some force other than Campbell obstructed performance of the CIW.
SIIS reasonably and understandably insists that the statutory phrase "capable of any gainful employment"[3] "clearly implies a legislative intent to grant benefits for the replacement of lost wages." SIIS thus concludes that since the prison system provided Campbell's daily bread and lodging, and since, by his own voluntary act, Campbell rendered himself unavailable for entry into the work force, he did not lose any wages.
Finding the System's reasoning unpersuasive, the majority concludes that it prefers to "leave such decisions to the discretion of the legislature." I must agree with SIIS. Campbell, by his own deliberate act, removed himself from the work force and should not be rewarded at the expense of the solvency of the System during his period of incarceration.[4]
Campbell first preyed on society by committing an act of burglary which ultimately resulted in the incarceration that prevented him from attending the CIW which, under normal circumstances, would have been a necessary condition for receiving further temporary total disability benefits. In prison, Campbell received board and room courtesy of the Nevada taxpayers. Finally, since he was in prison and could not attend his medical evaluation (CIW), today's opinion presents Campbell with a second layer of taxpayer benefits on grounds that in committing his crime, he did not intend to hinder his required examination. With due respect to my colleagues in the majority, I am unable to find any sensible reason for agreeing, including the fact that a majority of our sister courts evidently drink from the same well. Campbell, and Campbell alone, was responsible for not keeping his appointment for the CIW. Whether he intended, by his criminal act, to be apprehended and jeopardize his entitlement to industrial compensation is of no moment. The result is identical, whether he voluntarily avoided the CIW or, by his voluntary criminal act, denied himself the opportunity to keep the CIW appointment.
Moreover, I am of the opinion that the never-ending, ever-increasing governmental claim on the fruits of taxpayers' labor will one day soon reach an intolerable limit. When it does, I seriously doubt that we will tolerate double recoveries by incarcerated felons.
For the reasons specified above, I respectfully dissent.
NOTES
[1] Campbell had previously been sentenced to four and one-half years of probation following a burglary committed in 1983. Campbell was charged with violating his probation in September of 1989 following a domestic dispute. Consequently, Campbell was sent to the state penitentiary for a period of one year.
[2] NRS 616.535 provides in pertinent part:

1. Any employee who is entitled to receive, compensation under this chapter shall, if:
(a) Requested by the insurer; or
(b) Ordered by an appeals officer or a hearing officer,
submit himself [or herself] for medical examination at a time and from time to time at a place reasonably convenient for the employee, and as may be provided by the regulations of the department.
....
4. If the employee refuses to submit to any such examination or obstructs it, his [or her] right to compensation is suspended until the examination has taken place, and no compensation is payable during or for the period of suspension.
(Emphasis added.)
[3] NRS 616.585(4) provides: "4. For purposes of the payment of benefits for a temporary total disability under this section, the period of temporary total disability ceases when any physician... is capable of any gainful employment." (Emphasis added.)
[4] SIIS maintains that its position is supported, by analogy, by the July 3, 1990, amendment to the Nevada Administrative Code entitled "Modified Program For Offenders In Prison Industry Program." NAC 616.722 provides:

1. An offender is not entitled to accrue or be paid any compensation for temporary total disability, temporary partial disability, permanent partial disability or permanent total disability while he is incarcerated.
2. Payment of compensation begins upon the release of the offender from incarceration on:
(a) Parole;
(b) Final discharge; or
(c) Discharge from custody by order of a court of competent jurisdiction.
3. Compensation will be discontinued during any subsequent period of incarceration in:
(a) A facility of the department of prisons; or
(b) Any other federal, state or local prison system.
(Emphasis added.) While the above language is persuasive at first blush, the scope of this section is limited to those "injured or killed in the course and scope of ... employment in the prison industry program.... The program does not include coverage for an injury which occurred before the offender was confined at a facility operated by the department of prisons." NAC 616.710 (emphasis added). Therefore, this section specifically excludes those in Campbell's position.
[1] There is no contention that Campbell needed his disability benefits in order to care for dependents. Presumably, if Campbell had family dependent upon him during his incarceration, welfare assistance would have been available to assist with their needs.
[2] See NRS 616.535 as set forth and highlighted in majority opinion, footnote 2.
[3] See majority opinion, footnote 3.
[4] I must assume under the majority's reasoning, that if Campbell had committed a crime resulting in a life sentence, he would have received compensation from the System indefinitely.